761 S.E.2d 234

**In the Matter of William Jones RIVERS, III, Respondent.**

**Appellate Case No. 2014–001185.**

**No. 27414.**

Supreme Court of South Carolina.

Submitted June 13, 2014.

Decided July 16, 2014.

Lesley M. Coggiola, Disciplinary Counsel, and Sabrina C. Todd, Assistant Disciplinary Counsel, both of Columbia, for Office of Disciplinary Counsel.

William Jones Rivers, III, of Darlington, pro se.

PER CURIAM.

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent (Agreement) pursuant to Rule 21 of the Rules for Lawyer Disciplinary Enforcement (RLDE) contained in Rule 413 of the South Carolina Appellate Court Rules (SCACR). In the Agreement, respondent admits misconduct and consents to disbarment with conditions prior to seeking readmission. We accept the Agreement and disbar respondent from the practice of law in this state. In addition, respondent shall comply with each of the conditions set forth hereafter in this opinion prior to seeking readmission to the practice of law in this state. The facts, as set forth in the Agreement, are as follows.

## *Facts*

### A.  Self–Report and Background

In November 12, 2012, after learning his firm's trust account was being investigated by ODC, respondent self-reported his conduct to ODC. He explained that his law partner, John Schurlknight (Partner), handled all of the firm's accounts, including its trust accounts. Respondent admitted

that approximately six years before his self-report, Partner told him that the firm had a shortage in the trust account. Partner's plan to resolve the issue was to use money belonging to other clients to keep the account afloat. Respondent did nothing to prevent the implementation of this plan and, as a result, the firm began the self-perpetuating cycle of misappropriation of client funds. Respondent actively participated in this process.

In May 2011, Partner told respondent that the trust account was short a large sum owed to clients, Mr. and Mrs. A, and that Mr. and Mrs. A agreed to accept monthly payments until the entire amount was repaid. Again, respondent took no action to protect the firm's clients, the firm's future clients, or third parties. On June 1, 2011, respondent and Partner signed and gave Mr. and Mrs. A a promissory note acknowledging they owed them $1,695,000 and promised to pay $12,000 per month until the debt was satisfied. The debt was owed because Partner had misappropriated proceeds on claims he settled without Mr. and Mrs. A's knowledge.

Although the exact manner in which the funds were misappropriated varied to some extent from case to case, the firm settled many cases without the respective clients' knowledge or consent and misappropriated some or all of the proceeds. Attorneys and other staff members of the firm routinely signed the names of clients to settlement documents and endorsed their names on settlement checks. Respondent and Partner routinely lied to clients, medical providers, and other lienholders about the status of individual cases.

The ODC investigation that triggered respondent's November 12, 2012, self-report arose from Partner's handling of Mrs. B's personal injury case and her husband's loss of consortium's claim. Partner failed to keep Mr. and Mrs. B informed of the status of their claims and settled their case for $103,000. The settlement documents bearing the couple's purported signatures were forgeries and the funds were misappropriated. Mrs. B's medical bills, which exceeded the amount of settlement, were not paid. Frustrated at her inability to receive information from Partner, Mrs. B went to attorney J. Ashley Twombley. Partner would not respond to Mr. Twombley's efforts to facilitate communication with Mr. and Mrs. B

and ignored demands for the file after Mrs. B hired Mr. Twombley. Mr. Twombley discovered the settlement without Partner's assistance and filed a complaint. Mr. B also filed a complaint.

Partner committed suicide on November 13, 2012. On November 20, 2012, the Court placed respondent on interim suspension. *In the Matter of Rivers*, 408 S.C. 137, 758 S.E.2d 483 (2012). Many of the clients first learned their cases had been settled after they collected their files from the attorney to protect clients' interests. The firm's accounts were overdrawn at that time. Many clients also discovered their medical bills went unpaid and that their credit has been damaged.

■ For most clients, respondent or Partner held an extremely broad power of attorney secured at the onset of representation. The power of attorney gave the attorney the authority to:

> sign [the client's] name to any documents, pleading, draft, release, or other instrument in connection with this case or the settlement of the same and, to endorse and deposit for payment any negotiable instrument and to disburse the proceeds received.

Although respondent and others at the law firm routinely signed clients' names to settlement checks and documents, they never noted the signatures were affixed pursuant to a power of attorney.[1]

Respondent contends he did not personally take any of the stolen funds, but acknowledges that the firm's collection of fees in these cases as well as his collection of any attendant salary was entirely inappropriate. Although respondent produced some bank statements to Disciplinary Counsel during an interview, he was unable to produce the vast majority of financial records required by Rule 417 because the records

---

1. Although attorneys customarily have clients sign a power of attorney to convenience the client by facilitating the deposit of settlement proceeds, a client does not abdicate the right to be informed of settlement offers or the right to make settlement decisions by signing a power of attorney. Further, no power of attorney can obviate a lawyer's responsibility to "abide by a client's decision whether to make or accept an offer of settlement of a matter." Rule 1.2, Rules of Professional Conduct, Rule 407, SCACR.

were not maintained. As a result, a complete picture of receipts and disbursements is not available.

On February 6, 2014, respondent pled guilty to one count of mail fraud in violation of 18 U.S.C. § 1341. He has yet to be sentenced, but in his plea agreement he agreed to surrender all assets that would be subject to forfeiture, to make full restitution in an amount to be determined at sentencing, and to confess a monetary judgment in the amount of $1,248,135 representing the gross proceeds of the conduct underlying his conviction.

The Lawyers' Fund for Client Protection (Lawyers' Fund) received more than $1,286,000 in claims from respondent's clients and more than $3,800,000 in claims from Partner's clients. After investigating these claims and limiting individual claims to $40,000 per client, the Lawyers' Fund approved more than $605,000 of the claims involving respondent and $746,000 of those involving Partner. The Lawyers' Fund then paid the maximum of $200,000 to respondent's clients and $200,000 to Partner's clients, with each client receiving a pro rata share of the available funds. *See* Rule 411, SCACR.

### B. Respondent's Cases

#### *Matter I*

In February of 2012, respondent settled Client C's workers' compensation case for $110,000 without his client's knowledge and submitted a forged document to the Workers' Compensation Commission. To conceal the settlement, respondent then began sending Client C checks in roughly the amount of his temporary disability payments and explained that the change in the amount was an administrative issue. Client C discovered that his case had been settled only when he investigated why the last two checks he received from the firm bounced.

#### *Matter II*

In March of 2011, respondent settled Client D's workers' compensation case for $25,000. Respondent submitted a forged document to the Workers' Compensation Commission and told Client D the case was still pending. The funds were misappropriated. Client D learned of the settlement after respondent was placed on interim suspension.

## Matter III

Respondent settled Client E's workers' compensation case for $5,200 without Client E's consent and submitted a forged fee petition to the Workers' Compensation Commission indicating Client E would receive $3,354.48. The funds were misappropriated.

## Matter IV

Respondent settled Client F's personal injury case for $50,000, but did not disburse any of the funds to Client F.

## Matter V

Respondent settled Client G's personal injury claim for a total of $110,000 without his client's knowledge or consent. Respondent actively misled Client G about the status of his case. Client G learned of the settlement six months after it occurred and first received proceeds eight months after settlement. Client G's medical bills totaling more than $35,000 were not paid; however, Client G was led to believe the bills had been paid.

## Matter VI

Respondent represented Client H as personal representative of her mother's estate in the estate's wrongful death action. Respondent settled the action for $147,500. Client H was aware of the settlement but only received $1,000 of the $88,802.12 the estate was to receive.

## Matter VII

Respondent represented Client I in a personal injury case that was settled in 2004 for $75,000. Respondent advised Client I a large portion of the proceeds had to be set aside to pay his mounting medical bills, but then failed to pay several of those bills. Client I's file indicates only $21,711.12 of the proceeds were properly disbursed.

## Matter VIII

Respondent settled Client J's personal injury claims for a total of $66,666 without his consent and told him his case was still pending. Client J learned his case was settled more than

one year after settlement when respondent was placed on interim suspension.

## Matter IX

Respondent represented Client K on her claims arising from an accident with an uninsured driver. Respondent settled Client K's claims against her insurance and her mother's insurance for a total available coverage of $75,000, but failed to safeguard the proceeds. He paid Client K a total of $21,390.46 in two payments more than a year later. Respondent did not pay her medical providers even though he negotiated a reduced payment with at least one provider. Two of Client K's medical providers have sent her bills to collections.

## Matter X

Respondent represented Client L in a personal injury case and agreed to accept a reduced fee in the event he could settle without litigation. Respondent was able to quickly settled her claims, but her care far exceed the $100,000 in available coverage, and her medical bills were not finalized at the time of settlement. Respondent told Client L that the entire recovery would have to be paid to her medical insurer. However, respondent never paid the medical insurer even though the insurer was willing to settle its subrogation interest for $33,333.33 which would have permitted Client L to have a recovery. All of the proceeds in Client L's case were misappropriated.

## Matter XI

Respondent settled Client M's personal injury case for a total of $55,000. Client M was unaware of the settlement and his name was forged on settlement documents. He received no proceeds and his medical bills were not paid.

## Matter XII

Respondent represented Client N on a personal injury matter. Client N's medical bills exceeded $500,000. In total, respondent collected $100,000 in Client N's case from three different policies. Client N never saw the settlement checks, did not endorse them, and did not sign any settlement docu-

ments. Client N's file does not indicate any of the settlement proceeds were paid to his medical providers.

### Matter XIII

Respondent represented Client O in a personal injury claim arising from a slip and fall. Client O repeatedly asked respondent or his staff about her case and was repeatedly told that the defendant would not offer a settlement. Upon review of her file after respondent's interim suspension, Client O discovered that respondent had settled her case for $7,500 and that someone had forged her signature to the general release.

### C. Partner's Cases and Other Firm Cases [2]

### Matter I

The firm represented Client P and his minor nephew in a personal injury case arising from a car accident. Client P's signature was forged on the insurance release for his claim and he was not advised of the settlement for more than a year after the proceeds were received. Client P also incurred $621.46 in interest on a $1,895 medical bill Partner falsely claimed he paid. Partner settled the minor's claim for $100,000 and misappropriated the net proceeds of $40,008.92.

### Matter II

Client Q and her son were injured in a car accident. Partner settled the claims for $10,900 without Client Q's knowledge in October 2012 and her signature was forged on the proceeds check. Partner thereafter lied to Client Q about the status of the case.

### Matter III

Respondent initially represented Client R although her file was later assigned to an associate. On the associate's cases, Partner assumed the role of negotiating and paying medical bills and Partner's staff prepared the settlement memos. Client R was led to believe all of her medical bills were paid

---

2. Respondent is responsible for Partner's misconduct because he ratified specific acts of Partner's misconduct and was aware of Partner's practice of misconduct but failed to take any reasonable remedial action. Rule 5. 1, RPC, Rule 407, SCACR.

when her case settled, however, several bills totaling $1,903 were not paid.

## Matter IV

Partner and an associate handled multiple matters involving Client S's minor niece. The child's father already had a workers' compensation and personal injury claim arising from an automobile accident when he subsequently died in another automobile accident. A year later, the child's mother was killed in a separate automobile accident. The firm handled all claims related to both parents, but the minor child did not receive all proceeds to which she was entitled. Partner lied to at least one creditor about the status of the claims involving the mother's death and falsely claimed her funeral bill was paid from settlement proceeds. Additionally, the files contain several documents forged after the associate's departure from the firm as well as records of one disbursement that did not occur.

## Matter V

Client T hired an associate in the firm to represent him in a personal injury case arising from a serious automobile accident in North Carolina. Throughout the case, Client T suffered diminished brain function that he asserted was caused by the accident. The associate was admitted pro hac vice for Client T's litigation. No other attorney in the firm was admitted to the North Carolina Bar although Partner worked with the associate on the case. The associate remained involved in the case after he left the firm.

Because of Client T's deteriorating health, Partner prepared and Client T executed a power of attorney in favor of his brother, Mr. C. Partner and the associate attended mediation with Client T and Mr. C, but the mediation failed when Client T rejected a $400,000 settlement offer. Shortly after mediation, Partner settled the case for $400,000 without the knowledge or consent of Client T or Mr. C. Client T's name was forged to settlement documents and Partner arranged to have the settlement proceeds released to the firm rather than to the associate who was counsel of record. Client T's endorsement was forged on the check and the proceeds were deposited into a South Carolina bank with no North Carolina branch-

es in violation of the North Carolina Rules of Professional Conduct. Partner misappropriated the proceeds. Partner also paid the associate a fee even though Client T had never agreed to a fee split. Client T acknowledges he received advances from Partner, but the exact amount is in dispute. Client T filed a lawsuit which is currently pending. Partner's conduct violated numerous provisions of the North Carolina Rules of Professional Conduct.

### Matter VI

Partner settled Client U's personal injury claim for $10,000 and his related property claim for $2,500. Client U was unaware of the settlement and his signature was forged on the two releases sent to the liability insurance carrier. Client U did not receive any proceeds and his file indicates his medical providers were not paid.

### Matter VII

A medical provider complained that the firm settled fifty-three (53) cases without paying the provider and falsely reported the cases had not yet settled. Respondent represented four (4) of the clients who bills were not paid. The provider reports the unpaid bills exceed $250,000.

### Matter VIII

Partner represented Client V in a workers' compensation case and related personal injury claim. The workers' compensation case settled, but the employer did not waive its subrogation interest and put Partner and the at-fault driver on notice of its lien in the amount of $95,316.80. Thereafter, Partner settled the personal injury claim and the proceeds were paid directly to the firm. Counsel for Client V's employer approached Partner about the failure to honor the subrogation lien, but Partner failed to respond to requests for documentation of proceeds or disbursements. The employer believes most or all of the proceeds were misappropriated by the firm.

### Matter IX

Partner represented Client W in a personal injury case. Partner settled the case for $125,000 but actively lied to Client

W about the status of the case. Client W learned of the settlement after Partner's death. Client W never executed a power of attorney in favor of Partner or the firm, but discovered a forged power of attorney in favor of Partner in his file.

## *Matter X*

Client X hired Partner after settling her personal injury claim with the liability carrier for the policy limits. Client X insisted Partner not settle her underinsured motorist claim for less than the available coverage of $75,000. Partner thereafter settled the claim for $25,000 without Client X's knowledge, lied to her about the status of the case, and misappropriated the money. When Client X confronted Partner about some of his lies, he admitted what he had done and paid her a total of $75,000, three times the amount he had collected on her behalf without her permission. The funds Partner used to pay Client X were misappropriated from other clients.

## *Matter XI*

An associate with the firm represented Client Y in a personal injury matter. The associate settled the claim with Client Y's permission. Client Y was presented with a settlement memo indicating all of her medical bills were paid, but none were paid at the time she received her portion of the proceeds. Eventually, two of her providers were paid but the remaining medical bills, totaling $1,799.63, were never paid.

## *Matter XII*

Attorney Eric Poulin reported that his office represents fifteen (15) clients whose cases respondent and Partner settled without the clients' knowledge. Respondent's firm received a total of $304,153 in settlement proceeds on behalf of the clients. The clients were unaware of the settlements and many of their medical bills were left unpaid. One client whose case was settled for $100,000 received several small payments from the firm which he believed were advances against future proceeds. The remaining clients received no proceeds. Additionally, Mr. Poulin represents a former firm client whose claim was neither settled nor preserved before the expiration of the statute of limitations.

## *Matter XIII*

Partner paid Client Z $1,000 to secure him as a client on his personal injury and workers' compensation claims arising from a single accident. Partner failed to adequately communicate with Client Z and settled his claims without his knowledge. Although Partner never provided Client Z with a complete accounting of receipts and disbursements, Client Z acknowledges he received numerous advances from Partner that may have equaled or exceeded the total proceeds collected on his claims.

## *Matter XIV*

Partner settled Client AA's personal injury case for $23,500 shortly after receiving his medical bills. Client AA was unaware of the settlement and approximately ten months later, Partner advised her he settled the case for $6,900. Partner paid Client AA $1,000 at that time and presented her with a settlement memo indicating her medical providers were paid. She has since learned that Partner did not pay at least one of her medical bills.

## *Matter XV*

Partner represented Client BB in a personal injury case. Partner settled Client BB's case without his knowledge or consent. Client BB received no proceeds from the settlement.

## *Matter XVI*

Partner took over Client CC's personal injury case upon the departure of the assigned firm associate. Client CC's medical bills exceeded the amount of available coverage. The settlements from Client CC's liability and underinsured coverage claims totaled $197,000. Additionally, $1,000.00 in Med Pay and $5,000 in personal injury protection coverage were collected. Client CC was not informed of the settlements, did not sign any of the settlement documents or checks, and his file does not indicate how the proceeds were disbursed.

## ***Law***

Respondent admits that by his conduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.2 (lawyer shall abide by

client's decisions concerning objectives of representation); Rule 1.4 (lawyer shall keep client reasonably informed about status of matter and promptly inform client of decisions requiring client's informed consent); Rule 1.15 (lawyer shall safekeep client property); Rule 3.3 (lawyer shall not make false statement of fact to tribunal); Rule 4.1 (in course of representing client, lawyer shall not make false statement of material fact to third person); Rule 5.1(c) (lawyer shall be responsible for misconduct of another lawyer when lawyer knows of and ratifies conduct or knows of conduct and fails to take reasonable remedial action); Rule 5.3 (lawyer shall be responsible for misconduct of non-lawyer staff when lawyer knows of and ratifies staff's conduct or knows of conduct or fails to take reasonable remedial action); Rule 8.3(b) (when lawyer knows another lawyer has committed violation of Rules of Professional Conduct that raises substantial question as to that lawyer's honesty, trustworthiness or fitness as lawyer in other respects, lawyer shall inform the appropriate professional authority); Rule 8.4(b) (it is professional misconduct for lawyer to commit criminal act that reflects on lawyer's honesty, trustworthiness, or fitness in other respects); Rule 8.4(c) (it is professional misconduct for lawyer to commit criminal act involving moral turpitude); Rule 8.4(d) (it is professional misconduct for lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(e) (it is professional misconduct for lawyer to engage in conduct prejudicial to administration of justice). Respondent further admits that, by his conduct, he violated the Lawyer's Oath found in Rule 402(k), SCACR, and violated the recordkeeping provisions of Rule 417, SCACR.

Respondent also admits he has violated the following Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR: Rule 7(1)(a) (it shall be ground for discipline for lawyer to violate Rules of Professional Conduct); Rule 7(a)(4) (it shall be ground for discipline for lawyer to be convicted of crime of moral turpitude or serious crime); Rule 7(a)(5) (it shall be ground for discipline for lawyer to engage in conduct tending to pollute the administration of justice or to bring the courts or the legal profession into disrepute or conduct demonstrating an unfitness to practice law); and Rule 7(a)(6) (it shall be ground for discipline for lawyer to violate the oath of office

taken to practice law in this state and contained in Rule 402(k), SCACR).

## *Conclusion*

We accept the Agreement for Discipline by Consent and disbar respondent from the practice of law in this state. Respondent shall not apply for readmission until he has completed all terms and conditions of his criminal sentence, including the payment of fines and restitution, has reimbursed the Lawyers' Fund for all expenditures made on claims filed against him or Partner, and has made restitution to his clients and Partner's clients who filed approved claims with the Lawyers' Fund but were not fully reimbursed for their losses. Within fifteen (15) days of the date of this opinion, respondent shall file an affidavit with the Clerk of Court showing that he has complied with Rule 30 of Rule 413, SCACR, and shall also surrender his Certificate of Admission to the Practice of Law to the Clerk of Court.

**DISBARRED.**

TOAL, C.J., PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.